IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LAMAR WILLIAMS,                          *

    Plaintiff,                          *

v.                                       *          Civil Action No. GLR-22-1882

NICHOLAS FONTANEZ, et al.,               *

    Defendants.                         *

***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants' Second Motion to Dismiss (ECF No. 62) and self-represented Plaintiff Lamar Williams' (1) Motion for Leave to Include Complaint of Obstruction of Justice and Possible Collusion (ECF No. 57), (2) Rule 7(b) Emergency Motion for Relief (ECF No. 68), (3) Motion to Submit a Redlined/Amended Response in Opposition (ECF No. 72), (4) Motions to Submit a Surreply (ECF No. 73, 78), (5) Motion for 12-Hour Extension to File Reply (ECF No. 75), and (6) Motion to Submit a Supplemental Surreply (ECF No. 80). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant the Second Motion to Dismiss, the Motion to Submit a Redlined/Amended Response in Opposition, the Motion for 12-Hour Extension to File Reply, and the Motions to Submit a Surreply, and deny the Motion for Leave to Include Complaint of Obstruction of Justice and Possible Collusion, the Rule 7(b) Emergency Motion for Relief, and the Motion to Submit a Supplemental Surreply.

## I.    BACKGROUND

### A.    __Factual Background__[1]

Plaintiff Lamar Williams is a self-identified black man and a member of the LGBTQ community who suffers from anxiety, depression, and attention deficit hyperactivity disorder ("ADHD"). (See 2d Am. Compl. ¶ 4, ECF No. 55). Williams was an engineer for the Baltimore City Department of Transportation ("DOT") Conduit Division from April 18, 2022 to July 25, 2022. (Id. ¶ 15). Defendants Nicholas Fontanez, Ola Olaminde, P.E., Steve Sharkey, Amal Abid, John Habicht, Claudia Turkson, Kendrick McLeod, Gary Gilkey, and Josh Taylor were Baltimore City employees at that time. (See id. ¶ 6). On Williams' first day of work on April 18, 2022, he told his supervisor about his mental health conditions and that he might need time off for doctors' appointments. (Id. ¶ 4).

While Williams was still in his probationary period at DOT, he received a work request to fix the HVAC unit in Suite 203. (Id. ¶ 22). The unit was "unbearably hot" and the air quality was low. (Id. ¶¶ 30, 33). A supervisor, John Habicht, told him to reach out to contractors directly to get quotes for the repairs. (Id. ¶ 26). The contractors told Williams that the HVAC unit needed to be replaced, (id.), but when he conveyed this to Habicht and informed him of the price, Habicht told him that he should not have contacted contractors directly and that he didn't "seem to understand how things are done with Baltimore City," (id. ¶ 32). Williams retorted that he knew what he was doing and that he had followed

---

[1] Unless otherwise noted, the Court takes the following facts from Williams' Second Amended Complaint (ECF No. 55) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Habicht's instructions. (Id.). Habicht then "got in his feelings" and told Williams not to get involved with work requests anymore. (Id.).

Williams then called another supervisor, Ola Olamide, to resolve the situation and the conflict with Habicht, but Olamide said that Habicht would address the issue. (Id.). Habicht then "defamed [Williams'] character" and complained about him to Josh Taylor, another supervisor, stating that he did not want to work with Williams on the HVAC issue and DOT should fire him. (Id.). On July 18, 2022, Williams spoke to Taylor about Habicht. (Id. ¶ 49). Williams said that Habicht was "a little childish" and he asked Taylor to identify Habicht's supervisor. (Id.). Taylor told him to "just let it go." (Id.).

On June 23, 2022, Williams emailed Habicht, with several other DOT employees copied on the message, to say that he did not like the way that Habicht spoke to him. (Id. ¶ 33). Taylor and Olamide suggested that the message was disrespectful and that Williams was being insubordinate. (Id.). Later that same day, Williams learned that upper management had replaced the broken HVAC unit in Suite 201, but they decided not to replace the one in Suite 203. (Id.). Williams alleges DOT has sufficient funds to replace both units. (Id. ¶ 34).

Williams subsequently apologized for his "vernacular" in speaking to Habicht. (Id.). Management forbade him from any additional advocacy on the HVAC issue and suggested that if the heat in Suite 203 bothered Williams, he could work remotely. (Id.). In late June 2022, Williams spoke with other black men at DOT, who alleged that Habicht was typically rude when speaking to "head strong black men" and that he once unfairly suspended a black man. (Id. ¶ 36). Williams suspected that Habicht's actions against him were racially

motivated. (Id. ¶ 40). He then complained about Habicht via email to Tamara Mays, a human resources ("HR") representative, and to Jason Ludd, Habicht's supervisor. (Id.). His email to Ludd did not mention race or discrimination; rather, it said that Habicht had done a "complete 180" about the contractor issue, that he had "bad mouthed" Williams to Olamide and Taylor, and that he was "highly unprofessional." (Id.). He also complained to Ludd that the HVAC unit had not been replaced and he asked Ludd to find a solution. (Id.).

Shortly thereafter, Williams did not have enough work to do. (Id. ¶ 41). He asked Olamide for more work and also requested an invitation to an upcoming project meeting. Olamide told him that if he joined the meeting, he should not attempt to "take over." (Id.). Williams further heard a rumor that Olamide told other DOT employees not to assign Williams any conduit plans for review, even though Williams was purportedly an asset to DOT and a good worker. (Id. ¶ 46). Williams also believes that Taylor defamed Williams' character to Olamide. (Id. ¶ 50).

On July 15, 2022, Williams emailed Amal Abid, a woman who worked for DOT, asking her if she would like to exercise and "trade secrets" together, but she did not respond to his message. (Id. ¶ 48). He later learned that she found his email offensive and that she complained to HR. (See id. ¶ 82).

On July 19, 2022, Williams received a meeting request for July 22, 2022 from Olamide and Chris Hubbard, the recently-promoted Engineering Supervisor. (Id. ¶¶ 43, 51). Williams suspected that the meeting concerned his complaint to Ludd and his advocacy to fix the HVAC unit, so he wanted an HR representative to attend the meeting with him. (Id. ¶ 51). An employee from HR declined to attend, and Olamide moved the

meeting up two days to July 20, 2022. (Id. ¶¶ 52, 54). On that day, Williams had a "severe anxiety headache," so he emailed Olamide to move the meeting and request that an HR representative attend. (Id. ¶ 54). Olamide responded that the meeting was not disciplinary and thus an HR representative need not attend, and he rescheduled the meeting. (Id.).

At the rescheduled meeting on July 21, 2022, Olamide reprimanded Williams for ignoring the chain of command by going "over his head" to complain to Ludd, continuing to get involved with the HVAC issue despite an order not to do so, and for being unprofessional in asking coworkers to work out and "trade secrets" with him. (Id. ¶ 57). Olamide further said that he had heard that Williams told a colleague that he was queer and polyamorous, which Olamide also considered unprofessional. (Id.). Hubbard said that he "didn't care" about the broken HVAC, but that he wanted to make sure that Williams and the other engineers were comfortable. (Id.).

Williams believed that the meeting ended on a positive note and that everything had been resolved. (Id.). On July 22, 2022, he emailed Ludd and told him to disregard his prior message complaining about Habicht and the HVAC unit. (Id. ¶ 59). In the interest of transparency, and because Olamide requested that he not reach out to Ludd without going through Olamide first, he forwarded Olamide the email he sent to Ludd. (Id. ¶ 59). Olamide responded with concern that Williams was unable to follow his instructions to not involve himself with the HVAC issue. (Id. ¶ 60).

That same day, Claudia Turkson visited Williams' office with her shirt "purposely" unbuttoned. (Id. ¶ 62). Williams requested that she button up her shirt. (Id.). Turkson revealed that she knew about his meeting with Olamide and Hubbard, and she suggested

that he not speak to Abid anymore. (<u>Id.</u>). She also suggested that he could romantically pursue one of their colleagues. (<u>Id.</u> ¶ 64). Later, Williams noticed that Turkson was speaking with Hubbard, and he believed that she was "slandering his name." (<u>Id.</u> ¶ 62). That evening, Williams emailed Hubbard and Olamide to complain about Turkson having her shirt unbuttoned. (<u>Id.</u> ¶ 63).

On July 26, 2022, Williams met with Nickolas Fontanez, Chief of HR at DOT. (<u>Id.</u> ¶ 67). Fontanez terminated Williams and refused to provide an explanation because Williams was a probationary employee. (<u>Id.</u> ¶ 68). Williams tried to plead his case, but Fontanez spoke over him and Williams found that to be disrespectful. (<u>Id.</u>). On July 27, 2023, Olamide sent out an allegedly defamatory email to the other engineers about Williams and his termination. (<u>Id.</u> ¶ 70). On August 1, 2022, Williams returned to DOT to collect his personal belongings, but Defendants did not let him in the building. (<u>Id.</u> ¶ 74).

Williams believed that he was terminated because he complained about the HVAC unit, disclosed he was a member of the LGBTQ community, emailed Abid about working out and trading secrets, and complained that Turkson's shirt was unbuttoned. (<u>Id.</u> ¶ 69). Williams speculated that Hubbard, Olamide, Sharkey, and Taylor wanted to terminate him because of his race, age, and sexual orientation. (<u>Id.</u> ¶¶ 111−14). He also alleges that Olamide favored either white men or engineers from foreign countries over "natural born Black American male[s]." (<u>Id.</u> ¶ 113).

On July 27, 2022, Williams filed a complaint in the Circuit Court for Baltimore City for injunctive relief seeking to maintain his employment with DOT. (<u>Id.</u> ¶ 70). He alleges that Kendrick McLeod and Gary Gilkey, attorneys for Baltimore City, responded by filing

defamatory material in the circuit court. (See id. ¶ 76). Specifically, McLeod said that Williams was "insubordinate" after his supervisors asked him to stop contacting management about the HVAC unit. (Id. ¶ 78).

**B.   Procedural History[2]**

On July 29, 2022, Williams filed his original Complaint in this Court. (ECF No. 1). He later filed Amended Complaints on October 26, 2022 and March 1, 2023. (ECF Nos. 23, 55). In his Second Amended Complaint, he seeks to add Baltimore City DOT-Conduits as a Defendant, (see ECF No. 55), and the Court ordered Williams to submit a U.S. Marshals' Service of Process form by March 22, 2023 so that DOT could be served as the Federal Rules of Civil Procedure require. (See Mar. 1, 2023 Order at 2, ECF No. 54). Williams was forewarned that failure to comply with Court orders and the Federal and Local Rules could result in the dismissal of his claims. (Id.). To date, the Court has not received a summons for DOT. Accordingly, Baltimore City DOT-Conduits is not a proper Defendant and the Court will direct the Clerk to terminate it from the docket.[3]

---

[2] Because the docket in this case is extensive, the Court includes only the necessary procedural history.

[3] The Court notes that in light of the Defendants' argument that Baltimore City DOT-Conduits is not an entity that can be sued, Williams has requested that the Court "change the name" of Defendant Baltimore City DOT-Conduits to Mayor and City Council of Baltimore. (See Pl.'s Am. Resp. Opp'n Mot. Dismiss ["Am. Opp'n"] at 26, ECF No. 72-1). The Court cannot simply substitute the name of one defendant for a new one because each defendant must be served in accordance with Federal Rule 4. Further, Williams did not properly move to add a defendant under Rule 15 or Rule 20. Accordingly, Mayor and City Council of Baltimore are not Defendants in this matter and Williams has only sued individual DOT employees.

Williams' Second Amended Complaint alleges: defamation (Count I); unlawful discrimination and retaliation in violation of the First Amendment and 42 U.S.C. § 1983 (Count II); violation of the equal protection clause of the Fourteenth Amendment (Count III); denial of due process (Count IV); negligence and dereliction of duty (Count V); violations of 18 U.S.C. §§ 241−42 (Count VI); intentional infliction of emotional distress (Count VII); and disability, race, color, sex, age, and sexual orientation discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA") and § 1983 (Counts VIII−XIII). (2d Am. Compl. ¶¶ 77–119). He seeks injunctive relief requiring DOT to rehire him, replace the HVAC unit, and reprimand Defendants, as well as front pay, lost income, emotional damages, and punitive damages. (Notice Relief Req. at 1−2, ECF No. 61). Shortly after filing the Second Amended Complaint, Williams filed a Motion for Leave to Include Complaint of Obstruction of Justice and Collusion on March 8, 2023. (ECF No. 57). Defendants filed an Opposition on March 9, 2023 (ECF No. 58) and Williams filed a Reply on March 16, 2023 (ECF No. 64).

On March 15, 2023, Defendants filed their Second Motion to Dismiss, or in the alternative, for Summary Judgment. (ECF No. 62). Williams filed a Rule 7(b) Emergency Motion for Relief on April 13, 2023 (ECF No. 68)[4] and he filed his Opposition to the

---

[4] Williams seeks immediate injunctive relief requiring Defendants to install a new HVAC unit in Suite 203. (Rule 7(b) Emergency Mot. at 1, ECF No. 68). He styles his Motion as one under Rule 7(b), which does not provide preliminary injunctive relief, but rather generally requires that a request to the Court must be made by a motion. See Fed.R.Civ.P. 7(b)(1). Because of Williams' pro se status, the Court will construe the Motion as a Motion for Preliminary Injunction under Rule 65.

"A preliminary injunction is an 'extraordinary and drastic remedy.'" See Munaf v. Geren, 553 U.S. 674, 689–90 (2008) (quoting 11A Charles Alan Wright, Arthur R. Miller,

Motion to Dismiss, together with several exhibits, on April 21, 2023. (ECF No. 70). On April 27, 2023, Williams filed an unopposed Motion to Submit a Redlined/Amended Response in Opposition to the Motion to Dismiss (ECF No. 72)[5] and Defendants filed their Reply to his Amended Response in Opposition on May 9, 2023. (ECF No. 77). Williams also filed two initial Motions to Submit a Surreply to the Defendants' Reply to the Motion to Dismiss (ECF Nos. 73, 78).[6] Defendants filed an Opposition to the first Motion to Submit a Surreply on April 27, 2023 (ECF No. 74). Williams filed a Motion for 12-Hour Extension to File Reply on May 4, 2023 (ECF No. 75)[7] and he filed his Reply on May 5, 2023. (ECF No. 76). Lastly, on May 24, 2023, Williams filed a Motion for Leave to Submit

---

& Mary Kay Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995)). A party seeking a preliminary injunction must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009). To demonstrate a likelihood of irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Med. Grp., 952 F.2d 802, 812 (4th Cir. 1991).

     Here, Williams fails to establish any of the necessary elements. In particular, Williams cannot show irreparable harm because he does not currently work for DOT and therefore he will remain unaffected by any action the Defendants take to repair the HVAC unit. Accordingly, his Rule 7(b) Emergency Motion for Relief will be denied.

     [5] Defendants did not file an opposition and they subsequently filed a Reply to Williams' Amended Opposition. (ECF No. 77). Accordingly, Williams' Motion to Submit a Redlined/Amended Response in Opposition (ECF No. 72) will be granted.

     [6] "Permission to file a surreply may be granted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Medish v. Johns Hopkins Health Sys. Corp., 272 F.Supp.3d 719, 722 (D.Md. 2017). Here, Defendants raised at least one new argument in their Reply—that Williams lacks standing to request some of his desired relief. (See Defs.' Reply to Pl.'s Am. Opp'n at 1, ECF No. 77). Accordingly, Williams' Motions to Submit a Surreply (ECF Nos. 73, 78) will be granted.

     [7] Williams' Motion for 12-Hour Extension of Time will be granted.

a Supplemental Surreply to the Motion to Dismiss. (ECF No. 80).[8] Defendants filed an

Opposition on May 25, 2023. (ECF No. 81).

## II.     DISCUSSION

### A.    Standards of Review

#### 1.     Motion to Dismiss[9]

Defendants have moved to dismiss the Second Amended Complaint in its entirety.

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to

"resolve contests surrounding the facts, the merits of a claim, or the applicability of

---

[8] Williams argues that the Court should grant leave for a supplemental surreply so that Williams can further explain his retaliation claim. (See Pl.'s Mem. Supp. Pl.'s Mot. Submit Supp. Surreply at 1, ECF No. 80-1). Because Williams does not allege a need to respond to new arguments raised by Defendants, the Court will deny his Motion. See Medish, 272 F.Supp.3d at 722 (explaining that a Court may allow a surreply if a defendant raises new arguments in its reply). Additionally, to the extent that Williams seeks to amend his Second Amended Complaint with additional allegations of retaliation, the Motion is also denied because he did not seek leave to amend under Federal Rule of Civil Procedure 15, nor did he comply with the requirements of Local Rule 103.6(a).

[9] Defendants' Motion is styled as a motion to dismiss under Federal Rule 12(b)(6) or, in the alternative, for summary judgment under Federal Rule 56. A motion styled in this manner implicates the court's discretion under Federal Rule 12(d). See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

Here, Defendants attach a DOT employment policy to their Motion to Dismiss. (ECF No. 62-2). The Court finds that it can properly decide the Motion under the Rule 12 standard without considering this document, and thus the Court declines to convert the Motion into one for summary judgment.

defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005). Complaints drafted by self-represented plaintiffs are held to a less stringent standard than those drafted by attorneys, and courts must liberally construe these complaints. See Johnson v. Silver, 742 F.2d 823, 825 (4th Cir. 1984). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v.

Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### 2.      Motion for Leave to Amend

A party may amend its complaint once as a matter of course within twenty-one days of serving it or within twenty-one days after the defendant files a motion to dismiss. Fed.R.Civ.P. 15(a)(1). For all other circumstances, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). When seeking leave to amend from this Court, a party must submit a copy of the proposed amended complaint as well as a red-lined comparison to the initial complaint. See Local Rule 103.6(a), (c) (D.Md. 2021). In general, a "court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). Importantly, though, justice does not require permitting leave to amend when amendment would prejudice the opposing party, the moving party has exhibited bad faith, or amendment would be futile. See Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 446 (4th Cir. 2001).

### B.      Analysis

### 1.      Defamation

Williams alleges multiple instances of defamation: (1) Habicht's alleged statements to colleagues, (2d Am. Compl. ¶ 79); (2) Taylor's alleged statements to Olamide, (id. ¶ 80); (3) Turkson's alleged statements to colleagues that Williams sexually harassed her over her unbuttoned shirt and that he created a hostile work environment because he mentioned being queer, (id. ¶ 81); (4) Abid's alleged statements to colleagues that Williams' invitation to exercise and "share secrets" together made her uncomfortable, (id. ¶ 82); and

(5) McLeod and Gilkey's statement that Williams was "insubordinate" regarding the HVAC unit, (id. ¶ 78). "[E]ach alleged defamatory statement constitutes a separate instance of defamation that must be specifically alleged." Doe v. Johns Hopkins Health Sys. Corp., 274 F.Supp.3d 355, 366 (D.Md. 2017) (internal quotation marks omitted). Accordingly, the Court will consider each in turn.

To establish a prima facie case of defamation under Maryland law, Williams must establish that (1) a defendant made a defamatory statement to a third person (publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) Williams thereby suffered harm. See id. at 365. Regarding the first element, "a defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." Id. Statements for which the words themselves impute the defamatory character are defamatory per se, such that the plaintiff need not plead additional facts demonstrating their defamatory nature. Id. at 365−66. Statements for which extrinsic facts are necessary to demonstrate the defamatory character of the words are defamatory per quod. Id. at 366.

As to the second element, a statement is false if it was "not substantially correct." Id. Establishing the third element, that a defendant is legally at fault, requires a showing that, at a minimum, the party making the false statement acted negligently. Id. For the fourth element, actual harm must generally be established, but in cases in which the

statement was defamatory per se and was made with actual malice, harm may be presumed. Id.

First, Williams' defamation claims against Habicht and Turkson are too vague and speculative to establish that any defamatory statements were made. Williams asserts that Habicht "slander[ed] [his] character" (2d Am. Compl. ¶ 79) and "bad mouthed" him, (id. ¶ 40), but he fails to identify the statements with specificity. Consequently, the Court cannot infer that Habicht made a defamatory statement. See Doe v. Salisbury Univ., 123 F.Supp.3d 748, 757 (D.Md. 2015) ("To satisfy federal pleading standards, a plaintiff must specifically allege each defamatory statement.").

As to the claims against Turkson, Williams says "[n]ot to sound paranoid, but it seemed as though Claudia Turkson was slandering my name and that the two of them [Turkson and Taylor] were discussing me." (2d Am. Compl. ¶ 62). He then assumes that Turkson complained about Williams' comments about his sexual orientation and that she felt uncomfortable over their exchange concerning the unbuttoned shirt. (Id. ¶¶ 34, 81). With these facts, Williams fails to establish his claim beyond a speculative level as required by Federal Rule 12(b)(6). See Twombly, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Second, Williams' claims against Taylor, Abid, and Gilkey, and McLeod fail to establish the second element because they are true. Taylor allegedly committed "continual slander of [Williams'] character," (2d Am. Compl. ¶ 80), but the only specific statement that Williams identifies is that Taylor told Olamide that Williams "was asking who John Habicht's supervisor was." (Id. ¶ 50). Williams confirms this in the Second Amended

14

Complaint, (id. ¶ 49), and therefore Williams cannot establish falsity as required by the second element. See also N.Y. Times Co. v. Sullivan, 376 U.S. 254, 274 (1964) (holding that truth is an absolute defense to a defamation claim).

Next, Abid allegedly told colleagues that Williams' email about exercising and sharing secrets together "made her uncomfortable." (2d Am. Compl. ¶ 82). Abid's statement appears to an accurate one concerning an unactionable opinion, and Williams certainly did not establish its falsity. Finally, regarding Gilkey and McLeod's statement that Williams was insubordinate, this statement is also true. Although Williams "categorially den[ies] any claims that [he] was insubordinate," (id. ¶ 79), his own Second Amended Complaint shows that he was instructed to drop the HVAC issue, but that he refused to do so. (See id. ¶¶ 34, 40).

Accordingly, Williams' defamation claims (Count I) will be dismissed.

### 2.    First Amendment Violation & Retaliation

In Count II, Williams raises a claim that Defendants violated the First Amendment by retaliating against him for his alleged protected speech concerning the HVAC unit, his membership in the LGBTQ community, Habicht's conduct, and his right to have an HR representative with him in the July 21, 2023 meeting. (2d Am. Compl. ¶ 85).[10] Defendants

---

[10] The Court notes that Williams also alleges retaliation because he reported Habicht's racial bias. (2d Am. Compl. ¶ 85). However, Williams provided his email reporting Habicht to Ludd, and there is no mention of race, (id. ¶ 40) and Williams does not otherwise allege that he complained of racial bias to anyone at DOT. Although the Court is required to take Williams' allegations as true, his claim is contradictory on the face of his Second Amended Complaint and is unsupported by any specific facts showing that he complained about race. Accordingly, the Court need not determine whether Defendants violated Williams' First Amendment rights due to race-related speech.

argue that speech related to these issues does not constitute protected speech under the First Amendment. (Mem. Supp. Defs.' 2d Mot. Dismiss ["Mot. Dismiss"] at 10, ECF No. 62). At bottom, the Court agrees with Defendants.

Not all speech by government employees is protected by the First Amendment. Indeed, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). The government has "far broader powers" as an employer to restrict speech than it does to restrict the speech of the general public. See, e.g., Waters v. Churchill, 511 U.S. 661, 671 (1994) ("[T]he government as employer indeed has far broader powers than does the government as sovereign.").

Nevertheless, "public employees do not surrender all their First Amendment rights by reason of their employment." Garcetti, 547 U.S. at 417 (citing Pickering v. Bd. of Ed. of Twp., 391 U.S. 563, 568 (1968)). To determine whether a public employee's speech merits First Amendment protection, courts balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, 142 (1983) (quoting Pickering, 391 U.S. at 568). If the employee does not speak as a citizen on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Garcetti, 547 U.S. at 418. Further, when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for

First Amendment purposes, and the Constitution does not insulate their communications from discipline." Id. at 421.

To determine whether speech involves a matter of public concern, courts examine the content, form, and context of the speech at issue in light of the entire record. See Connick, 461 U.S. at 147–48. Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community. See id. at 146. The public-concern inquiry centers on whether "the public or the community is likely to be truly concerned with or interested in the particular expression." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004). Further, the Fourth Circuit has consistently held that "personal complaints and grievances about conditions of employment are not matters of public concern." See Durham v. Jones, 737 F.3d 291, 300 (4th Cir. 2013).

Finally, if a plaintiff is able to establish protected First Amendment activity, he must also show (1) that the defendants took some action that adversely affected his First Amendment rights, and (2) there was a causal relationship between the protected activity and the defendants' conduct. Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 346 (D.Md. 2011).

Here, Williams' complaints about the HVAC unit, his supervisors actions, and his right to have an HR representative present were clearly not speech involving a matter of public concern because they relate to personal grievances or concerns about the conditions of his employment. See Durham, 737 F.3d at 300. As for his speech relating to his membership in the LGBTQ community, while this speech may be protected under the First

Amendment, Williams does not plead any facts showing a causal relationship between his termination and his declaration that he is polyamorous and queer.

Accordingly, his First Amendment claim will be dismissed.

### 3.     Equal Protection

In Count III, Williams alleges a violation of the equal protection clause of the Fourteenth Amendment. (2d Am. Compl. ¶ 89). He claims that he was treated differently and terminated after disclosing that he is a member of the LGBTQ community and that he suffers from anxiety and depression. (Id.). The Court will dismiss Williams' equal protection claim because it finds the claim to be a rewording of his First Amendment retaliation claim, which the Court has already decided must fail as a matter of law. Dismissal of this claim is appropriate because it is well-established law in the Fourth Circuit that "a pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause." Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999); see also Kirby, 388 F.3d at 447 ("The claims based on the allegation that Kirby was treated differently in retaliation for his speech are, at their core, free-speech retaliation claims that do not implicate the Equal Protection Clause." (internal quotation marks omitted)).

### 4.     Due Process

In Count IV, Williams alleges a violation of his due process rights because Defendants deprived him of a protected interest in his employment. (2d Am. Compl. ¶¶ 92−94). Williams further alleges that the termination occurred without proper

procedural safeguards because his supervisors would not allow an HR representative to attend meetings with him. (Id.).

The due process clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In general, in order to succeed on a due process claim, whether substantive or procedural, plaintiffs must show: "(1) that he has a constitutionally protected liberty or property interest; and (2) that he has been deprived of that protected interest by some form of state action." Hamilton, 807 F.Supp.2d at 356 (cleaned up).

A public employee's liberty interest claim stems from two discrete rights protected by the Fourteenth Amendment:

> (1) the liberty to engage in any of the common occupations of life, and (2) the right to due process where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him. In combination, these rights give rise to the liberty interest that is implicated by public announcement of reasons for an employee's discharge.

Id. (cleaned up). In order to establish a violation of these rights, a plaintiff must show that the employer's statements: "(1) placed a stigma on [his] reputation; (2) were made public by the employer; (3) were made in conjunction with [his] termination or demotion; and (4) were false." Id. at 357.

Here, Williams fails to establish the second element of his claim because any alleged stigmatizing remarks by DOT were never made public. Although Williams alleges that Olamide sent out a "division wide email" detailing Williams' termination and the reasons for it, he does not allege that DOT made any sort of public communication about him. (See

2d Am. Compl. ¶ 70). Additionally, Williams fails to identify any authority providing that it is a violation of the due process clause to be terminated or reprimanded without an HR representative present. Accordingly, Williams' due process claim will be dismissed.

### 5.  <u>Negligence and Dereliction of Duty</u>

Next, Williams broadly alleges negligence and dereliction of duty because Defendants failed to replace the HVAC unit. (Count V, 2d Am. Compl. ¶¶ 96−98). Defendants counter that he does not state an actionable claim under Rule 8 pleading standards. (Mot. Dismiss at 17). The Court agrees with the Defendants.

First, dereliction of duty is not a civil cause of action under federal or Maryland law, so that claim must be dismissed. Second, to state a claim for negligence under Maryland law, a plaintiff must plead four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." <u>Washington Metro. Area Transit Auth. v. Seymour</u>, 874 A.2d 973, 976–77 (Md. 2005).

Here, Williams fails to identify any authority to establish that that employers have a duty to provide air conditioning. Further, even if Defendants did have such a duty, Williams does not allege any actual loss or injury as a result of their failure to fix the HVAC unit. He says that he was sometimes hot or uncomfortable, but this description does not amount to damages, especially given that Defendants told Williams he could work from home while the HVAC unit was broken. (<u>See</u> 2d Am. Compl. ¶ 34). Accordingly, Williams' negligence claim will be dismissed.

6.    **18 U.S.C.  §§ 241, 242**

In Count VI, Williams alleges violations of two criminal laws: 18 U.S.C. § 241 and § 242. Section 241 prohibits a person from conspiring to injure another in violation of his constitutional or other legal rights. Section 242 prohibits a person from acting under the color of law to deprive another of his rights. The Court will dismiss these claims because this is a civil matter and Williams does not identify any authority permitting him to use these criminal statutes to plead a civil cause of action. Further, his claim appears to be a rewording of his already disposed of claims alleging violations of the First Amendment and § 1983. Accordingly, Count VI will be dismissed.

7.    **Intentional Infliction of Emotional Distress**

In Count VII, Williams alleges that he suffered extreme emotional distress and that "Defendants' conduct was intentionally reckless, and in deliberate disregard of a high degree of probability that emotional distress would result." (2d Am. Compl. ¶ 106). Defendants argue that Williams does not plead sufficient facts to establish his claim. (Mot. Dismiss at 17). Again, the Court agrees with the Defendants.

Courts have stated that "the tort of intentional infliction of emotional distress is rarely viable" in Maryland. Arbabi v. Fred Meyers, Inc., 205 F.Supp.2d 462, 466 (D.Md. 2002). In particular, alleged workplace conduct "almost never rises to the level of outrageousness, and almost never results in such severely debilitating emotional trauma, as to reach the high threshold invariably applicable to a claim of intentional infliction of emotional distress." Id. at 466. Plaintiffs must establish the following elements to plead a prima facie case: (1) the conduct in question was intentional or reckless; (2) the conduct

was extreme and outrageous; (3) there was a causal connection between the conduct and the emotional distress; and (4) the emotional distress was severe. Id. at 465–66. These elements must be pled with specificity: "[i]t is not enough for a plaintiff merely to allege that they exist; he must set forth facts that, if true, would suffice to demonstrate that they exist." Id. at 466.

Here, Williams fails to establish any element of his claim. Although he provides bald allegations that Defendants' conduct was intentional and caused extreme distress, (2d Am. Compl. ¶¶ 106−09), these allegations are conclusory, and the Court need not take them as true. Further, even liberally construing the Second Amended Complaint, there are no facts showing that Defendants' conduct was extreme and outrageous. Accordingly, the intentional infliction of emotional distress claim will be dismissed.

**8.    Race, Color, Age, Sex, Sexual Orientation, National Origin, and Disability Discrimination and Retaliation**

In Counts VIII−XIII, Williams asserts a hodge-podge of discrimination and retaliation claims against Baltimore City-DOT Conduits under § 1983 and the ADA: disability, race, color, national origin,[11] age, sex, and sexual orientation discrimination. (2d Am. Compl. ¶¶110−19). The Court has already dismissed all claims against Baltimore City-DOT Conduits because it was never served. Nevertheless, because Williams is self-represented and the Court must liberally construe his Second Amended Complaint, the

---

[11] Williams does not expressly include a claim for discrimination due to national origin in his Second Amended Complaint. However, because Williams is self-represented and he alleges that Olamide "only wants to supervise white men, or Engineers of color from other countries," (2d Am. Compl. ¶ 113), the Court determine whether he states a claim for national origin discrimination.

Court will address whether any of the individual defendants might be liable for discrimination or retaliation under § 1983. Section 1983 permits the filing of a civil action against a person acting under color of state law who causes a deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983.

First, as to the disability discrimination claim, the ADA provides the sole judicial remedy for such claims. Wilson v. Montgomery Cnty. Bd. of Trs., No. PWG-17-2784, 2018 WL 4300498, at *4 (D.Md. Sept. 10, 2018); Gatling v. Carter, No. PX-15-3723, 2017 WL 480756, at *1 (D.Md. Feb. 6, 2017). The ADA provides liability for employers only−not employees. See, e.g., Baird ex rel. Baird v. Rose, 192 F.3d 462, 471 (4th Cir. 1999). Because Williams sued individual Defendants only and not his employer as discussed above, his claims of disability discrimination due to his depression, anxiety, and ADHD must be dismissed.

Next, the Court turns to Williams' claims of race, color, national origin, age,[12] sex, and sexual orientation discrimination and retaliation. He alleges that he was terminated because he is black, male, queer and polyamorous, and older than some of his Defendant

---

[12] The Age Discrimination in Employment Act of 1967 ("ADEA") provides the sole judicial remedy for age discrimination claims. See Zombro v. Balt. City Police Dep't, 868 F.2d 1364, 1367 (4th Cir. 1989). Because Williams did not bring a claim under this statute, his age discrimination claim must be dismissed. However, as explained below, even if Williams had brought a proper ADEA claim, his age discrimination claim would still fail to state a claim under Title VII standards. Bodkin v. Town of Strasburg, Virginia, 386 F.App'x 411, 413 (4th Cir. 2010) (applying Title VII's McDonnell Douglas framework to ADEA claims).

supervisors. (2d Am. Compl. ¶¶ 112−16). Defendants argue that these claims must be dismissed because Williams failed to exhaust administrative remedies as required by Title VII. (Mot. Dismiss at 18). At bottom, the Court finds that Williams is not subject to Title VII's exhaustion requirements, but that his claims must nonetheless be dismissed for failure to state a claim for which relief can be granted.

Although plaintiffs raising a discrimination claim under Title VII in federal court must first file a complaint with the EEOC or the State, plaintiffs raising a discrimination claim under § 1983 are not subject to these requirements. See Patsy v. Bd. of Regents, 457 U.S. 496, 502 (1982) ("[E]xhaustion of administrative remedies in § 1983 actions should not be judicially imposed."). However, although § 1983 plaintiffs may escape Title VII's exhaustion requirements, their substantive claims are still subject to its legal framework. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (holding that McDonnell Douglas framework applies to § 1983 discrimination claims). A plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)). Unsupported or conclusory factual allegations devoid of any reference to actual events will not suffice and the Court need not take them as true. See United Black Firefighters, 604 F.2d at 847.

Williams offers no evidence of direct evidence of discrimination or retaliation. See Cole v. Fam. Dollar Stores of Md., Inc., 811 F.App'x 168, 175 (4th Cir. 2020) ("Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged

discriminatory attitude and that bear directly on the contested employment decision.'"

(quoting Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999))). Accordingly, the

Court will evaluate Williams' claims under the burden-shifting framework first articulated

by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a discrimination or retaliation claim under the McDonnell Douglas

burden-shifting framework, Williams must eventually put forth a prima facie case by

establishing that:

> (1) he belongs to a protected class;
> (2) he suffered an adverse employment action;
> (3) at the time of the adverse action, he was performing his job
> at a level that met his employer's legitimate expectations . . . ;
> and
> (4) he was rejected [or terminated] under circumstances giving
> rise to an inference of unlawful discrimination.

See Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011).

The precise formulation of the required prima facie showing will vary in "differing factual

situations," McDonnell Douglas, 411 U.S. at 802 n.13, and the elements were "never

intended to be rigid, mechanized, or ritualistic,'" Swierkiewicz v. Sorema N. A., 534 U.S.

506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

The Court is mindful that a Title VII plaintiff need not satisfy all the elements set

forth above to survive a motion to dismiss. See Swierkiewicz, 534 U.S. at 510 ("The prima

facie case under McDonnell Douglas, however, is an evidentiary standard, not a pleading

requirement."); accord Parker v. Child.'s Nat'l Med. Ctr., Inc., No. ELH-20-3523, 2021

WL 5840949, at *9 (D.Md. Dec. 9, 2021) ("At the motion to dismiss stage, a plaintiff need

not establish a prima facie case of discrimination."). Instead, at the motion to dismiss stage,

a plaintiff need only "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" Bing v. Brivo Sys., LLC, 959 F.3d 605, 617 (4th Cir. 2020) (quoting Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)), cert. denied, 141 S.Ct. 1376 (2021). Thus, the plaintiff must generally show that the employer took adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Adams, 640 F.3d at 558. This requirement can be met by showing that "similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).

The Court considers the "totality of the circumstances" in determining whether Williams has adequately alleged discrimination. See Strothers v. City of Laurel, 895 F.3d 317, 330–31 (4th Cir. 2018) ("[T]he connection between animus and conduct may be inferred from the totality of the circumstances."); see also Woods v. City of Greensboro, 855 F.3d 639, 649 (4th Cir. 2017) (concluding that a court "may infer discriminatory intent from evidence of a general pattern of . . . discrimination in the practices of a defendant"); Guirkin v. CMH Physician Servs., LLC, No. 3:20CV59, 2020 WL 6829769, at *7 n.13 (E.D.Va. Nov. 20, 2020) ("Although [plaintiff's] individual allegations do not by themselves prove discriminatory animus, the totality of circumstances surrounding his termination gives rise to the inference that [plaintiff] was fired, at least in part, because of his [protected status].").

Notwithstanding these qualifiers and the obligation to liberally construe the Second Amended Complaint, Williams' claims of discrimination and retaliation are deficient

because he fails to plead facts that would allow the Court to infer that he was terminated because of his race, color, age, national origin, sex, or sexual orientation. The Second Amended Complaint is rife with conclusory allegations which are insufficient to establish his claims. See United Black Firefighters, 604 F.2d at 847 (stating that courts need not accept conclusory allegations as true). These include his claims that: Taylor, Habicht, and Sharkey "wanted to get rid of an uppity black," (see 2d Am. Compl. ¶¶ 112, 114, 116); Olamide "did not want to allow a natural born Black American male to succeed" and "only wants to supervise white men, or Engineers of color from other countries," (id. ¶ 113); and Hubbard (who is not a named Defendant in this matter) "did not want to supervise a black male, older male, brown male, or queer male," (id. ¶ 111).

At bottom, the only fact that shows even a possibility of discrimination is that in the July 21, 2022 meeting, Olamide stated that he found Williams' comments about being queer and polyamorous to be unprofessional. (Id. ¶ 55). However, this fact alone is insufficient to make Williams' claims plausible. Further, Williams does not provide any compelling comparator evidence that would tend to show his supervisors treated other employees outside of his protected classes better than him. He alleges that the other engineers were either white or from foreign countries and that they were not terminated, (id. at 113), but he does not establish that these employees were similarly situated to him, or that they engaged in the same conduct that he did without punishment. See Tinsley v. City of Charlotte, 854 F.App'x 495, 500–01 (4th Cir. 2021) (explaining that plaintiffs relying on comparator evidence must establish that they were subject to the same standards

and engaged in the same conduct without mitigating circumstances that would distinguish the employer's preferential treatment).

In sum, Williams' discrimination and retaliation claims are implausible on the face of his Second Amended Complaint. In fact, even viewing the facts in the light most favorable to him, the Court might infer that Williams was terminated not due to his race, color, age, sex, sexual orientation, or national origin, but because he: did not get along well with his colleagues, (see, e.g., 2d Am. Compl. ¶¶ 33, 40, 47, 62); engaged in or caused interpersonal disputes, (see id. ¶¶ 33, 62); ignored his employer's express instructions to drop the HVAC issue, (see id. ¶¶ 34, 40); ignored the chain of command in raising concerns, (id. ¶ 40); and sent a colleague an email about exercising and "trading secrets" that made her uncomfortable, (id. ¶ 48). See McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 588 (4th Cir. 2015) (finding plaintiff's complaint deficient because it "le[ft] open to speculation the cause for the defendant's decision" (quoting Twombly, 550 U.S. at 567)). Accordingly, the Court will dismiss Williams' retaliation and discrimination claims.

**9.     Motion for Leave to Amend**

Williams filed a Motion for Leave to Include Complaint of Obstruction of Justice and Possible Collusion (ECF No. 57), which shall be construed as a motion for leave to amend his Second Amended Complaint under Federal Rule 15. Williams appears to allege that Defendants McLeod and Gilkey, attorneys for Baltimore City, colluded with a judge in the Circuit Court for Baltimore City to obstruct justice and dismiss Williams' case before that court. (Mot. Leave Include Compl. Obstruction Justice ["Mot. Leave Amend"] at 1−2, ECF No. 57).

First, Williams did not comply with the Local Rules, which require a party to submit a copy of the proposed amended complaint as well as a red-lined comparison to the initial complaint. See Local Rule 103.6(a), (c) (D.Md. 2021). The Court has previously advised Williams of this rule, and it also has advised him that failure to comply with the Federal and Local Rules could result in the dismissal of his claims. (See Nov. 8, 2022 Order at 2−3, ECF No. 28). Accordingly, Williams' Motion will be denied.

The Court also notes that even if Williams had complied with the Local Rules, the Court would deny his Motion under the Rule 15 standard. Justice does not require permitting leave to amend when amendment would prejudice the opposing party, the moving party has exhibited bad faith, or amendment would be futile. Edell, 264 F.3d at 446. Additionally, an amendment must "relate back" to the date of the original pleading, meaning that it asserts a claim "that arose out of the conduct, transaction, or occurrence set out−or attempted to be set out−in the original pleading." Fed.R.Civ.P. 15(c)(1)(B).

Here, Williams' proposed amendment is prejudicial, futile, and it fails to relate back to his Second Amended Complaint. Williams also may have exhibited dilatory motives. This is his third attempt to amend his original Complaint and he tends to seek excessive extensions of time and to generally disregard Court deadlines and his obligations under the Federal and Local Rules. (See generally Feb. 8, 2023 Order, ECF 48). Further, the amendment prejudices Defendants because it raises two new legal theories on new facts. Laber v. Harvey, 438 F.3d 404, 427 (4th Cir. 2006) (explaining that amendments are prejudicial when they raise new legal theories requiring parties to gather and analyze new facts). Thus, it does not relate back to Williams' Second Amended Complaint, which

29

focuses on alleged tortious acts, discrimination, and retaliation in the course of Williams'
employment with DOT, not alleged collusion and misconduct in a separate civil action
before the Circuit Court. Finally, the amendment would also be futile because Williams
alleges only speculative facts of collusion between the judge, McLeod and Gilkey. (See
Mot. Leave Amend at 2). Accordingly, his Motion for Leave to Include Complaint of
Obstruction of Justice and Possible Collusion will be denied.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant the Second Motion to Dismiss (ECF
No. 62), the Motion to Submit a Redlined/Amended Response in Opposition (ECF No. 72),
the Motions to Submit a Surreply (ECF Nos. 73, 78), and the Motion for 12-Hour Extension
of Time (ECF No. 75). The Motion for Leave to Submit a Supplemental Surreply (ECF
No. 80), the Motion for Leave to Include Complaint of Obstruction of Justice and Possible
Collusion (ECF No. 57) and the Rule 7(b) Emergency Motion for Relief (ECF No. 68) will
be denied. A separate Order follows.

Entered this 5th day of June, 2023.


_____
/s/
George L. Russell, III
United States District Judge

30